DARALYN J. DURIE (CA SBN 169825)
DDurie@mofo.com
JOYCE LIOU (CA SBN 277720)
JLiou@mofo.com
JACK WILLIAM HAISMAN (CA SBN 346100)
JHaisman@mofo.com
HOLLY M. PETERSEN (CA SBN 351588)
HollyPetersen@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:    415.268.7000
Facsimile:    415.268.7522

Attorneys for Plaintiff
ANTHROPIC, PBC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Anthropic, PBC, | Case No. 3:26-cv-6754 |
| Plaintiff, | **COMPLAINT FOR TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, AND FALSE DESIGNATION OF ORIGIN** |
| v. | |
| Abnormal AI, Inc. (f/k/a Abnormal Security Corporation), | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

Plaintiff Anthropic, PBC ("Anthropic") brings this action against Defendant Abnormal AI, Inc. (f/k/a Abnormal Security Corporation) ("Abnormal"), and alleges as follows:

## SUMMARY OF THE ACTION

1.     This case arises from Abnormal's efforts to rebrand itself around Anthropic's distinctive commercial identity while competing in the same market for AI-powered enterprise security where Anthropic has already built substantial goodwill under its marks.

2.     Anthropic is one of the world's leading artificial intelligence companies and the maker of Claude, its family of flagship AI frontier models.  Since 2021, Anthropic has used the **ANTHROP\C** trademark (the "Anthropic Logo") and the **A\** trademark (the "Anthropic Symbol"), in connection with AI-related research, safety, and technological development.  Since 2023, Anthropic also has deployed signature animated motion sequences on its website and in promotional materials, in which the Anthropic Logo contracts into the Anthropic Symbol or expands from it (the "Anthropic Motions" and, collectively with the Anthropic Symbol, the "Anthropic Marks").

3.     The Anthropic Marks have become recognized source identifiers as a result of Anthropic's rapid growth and reputation for responsible AI development.  More than 300,000 businesses use Claude today, including nine of the Fortune 10 companies.  Anthropic's annualized run-rate revenue has grown from $100 million in January 2024 to over $47 billion in May 2026, and TIME has named Anthropic one of the most influential companies in the world.  To the companies, developers, and security teams that stake their operations on AI every day, the Anthropic Marks signal the quality and trust that Anthropic represents.

4.     Abnormal is an enterprise cybersecurity company.  In April 2025, Abnormal announced a comprehensive rebrand from "Abnormal Security" to "Abnormal AI," directed by an outside design agency that later described the project's goal as building for Abnormal "an identity to match a category leader."  With that rebrand, Abnormal adopted what it described as new "human-centered" AI messaging, which echoes Anthropic's founding mission, and replaced Abnormal's longstanding logo with one that closely replicates the Anthropic Symbol (the "Infringing Logo"):

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

1

| Abnormal's Infringing Logo | Anthropic's Anthropic Symbol |
|---|---|
| | |

5. Abnormal's rebrand also introduced animated motion sequences that replicate the Anthropic Motions (the "Infringing Sequences," and together with the Infringing Logo, the "Infringing Marks"). Like the Anthropic Motions, the Infringing Sequences animate between a longer-form brand name and a compact symbol:

| Progressive Images of the Anthropic Reverse Motion Sequence | | | | |
|---|---|---|---|---|
| | | | | |
| Progressive Images of Abnormal's Infringing Sequence | | | | |
| | | | | |

6. Confusion was immediate. When Abnormal announced its rebrand on LinkedIn, a member of the cybersecurity community asked whether Abnormal's "new logo look[ed] like Anthropic's or am I seeing double?" Another commenter confirmed what the above side-by-side comparison shows: the marks "look exactly the same."

7. That reaction is unsurprising. Anthropic and Abnormal both market AI-powered software to the same enterprise audiences, including security leaders, developers, and procurement teams. They appear at the same conferences, on the same marketplaces, and in the same partner ecosystems and software-governance workflows. By the time Abnormal unveiled its new identity in April 2025, Anthropic had already spent years building a public cybersecurity presence under the Anthropic Marks through research, conferences, government-backed cyber competitions, and demonstrations on the security capabilities of its commercial AI software.

8. After learning of the rebrand, Anthropic contacted Abnormal directly to raise its concerns and offered a reasonable transition period to phase out use of the Infringing Logo. Abnormal refused, telling Anthropic that it "will not transition to another logo."

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

2

9. Abnormal then expanded its use of the Infringing Marks by launching additional ⋀\-branded offerings, opening a San Francisco storefront bearing the Infringing Logo less than half a mile from Anthropic's offices, and seeking trademark protection in the United States and abroad.

10. Abnormal is free to compete in AI and cybersecurity. It is not free to do so under marks that are likely to confuse consumers into believing Abnormal's offerings originate from, are sponsored by, or are affiliated with Anthropic. Anthropic brings this action to stop Abnormal's infringing conduct, protect the goodwill embodied in the Anthropic Marks, and eliminate the likelihood of confusion with Anthropic's senior marks.

### PARTIES

11. Plaintiff Anthropic, PBC is a public benefit corporation organized under the laws of the State of Delaware and headquartered in San Francisco, California.

12. Defendant Abnormal AI, Inc., formerly known as Abnormal Security Corporation, is a corporation organized under the laws of the State of Delaware with its principal place of business at 8474 Rozita Lee Avenue, Suite 420, Las Vegas, Nevada 89113. On information and belief, Abnormal changed its corporate name from "Abnormal Security Corporation" to "Abnormal AI, Inc." effective March 28, 2025.

### JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 (actions arising under the Lanham Act); 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1338(a) (any Act of Congress relating to trademarks); and 28 U.S.C. § 1367 (supplemental jurisdiction).

14. This Court has personal jurisdiction over Abnormal. Abnormal has operated continuously in San Francisco since 2018, and markets and sells AI-powered cybersecurity software to customers here. In March 2026, Abnormal opened a customer-facing "Abnormal AI Hub" storefront at 3rd and Folsom Streets in San Francisco bearing the Infringing Logo on street-facing signage. Abnormal's use and promotion of the Infringing Marks—including at industry conferences attended by consumers in the Northern District—have also caused and continue to

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

3

cause injury to Anthropic in this district.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Abnormal resides in this judicial district within the meaning of 28 U.S.C. § 1391(c)(2).  Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Anthropic's claims occurred in this district, including Abnormal's adoption, promotion, and continued use of the Infringing Marks in commerce.

## GENERAL ALLEGATIONS

16.     Anthropic owns senior trademark rights in the Anthropic Marks, including the Anthropic Symbol and the Anthropic Motions, as described and depicted below.

17.     Beginning in April 2025, Abnormal adopted and began using in commerce the Infringing Marks for closely related and directly competing AI software products and services. Abnormal's conduct is likely to cause, and has already caused, consumer confusion as to source, affiliation, or sponsorship of Abnormal's goods and services.  If unabated, Abnormal's conduct will cause irreparable harm to Anthropic, including to its market position and the substantial goodwill associated with its brand.

### A.     Anthropic Is a Recognized Leader in the Artificial Intelligence Industry for its Innovative AI Systems

18.     Anthropic was founded in 2021 as a public benefit corporation dedicated to the responsible development of AI for the long-term benefit of humanity.  From the outset, Anthropic has publicly positioned itself as a human-centered AI company, focused on building systems that are safe and aligned with human values, with human feedback at the core of its development process.  Indeed, the name "Anthropic" is derived from the Greek anthropikos (ἀνθρωπικός), meaning "of or relating to humans," itself derived from anthropos (ἄνθρωπος), "human being."

19.     Then, in March 2023, Anthropic extended its founding principles to the commercial software market with the launch of Claude, its family of flagship AI frontier models. By March 2026, Anthropic's Claude app had become the No. 1 free app on both the iPhone App Store and the Google Play Store in the United States, and Anthropic had reached a valuation of $380 billion on a post-money basis.  As of September 2025, Anthropic's AI software offerings

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

4

were used by more than 300,000 businesses.  Today, Anthropic's customers include nine of the Fortune 10 companies, and Anthropic's offerings are available in more than 180 countries directly and through major cloud providers, including Amazon Web Services, Google Cloud, and Microsoft Azure.

20.    From its founding in 2021, Anthropic built its reputation through foundational AI safety and security research.  In December 2021, Anthropic published its seminal alignment paper formalizing the "helpful, honest, and harmless" framework and calling for AI systems that are "secure against alteration or misuse."  In 2022, Anthropic released a dataset of nearly 39,000 adversarial attacks designed to test how models respond to harmful prompts, and introduced Constitutional AI, which embedded specific instructions directing AI models to refuse assistance with criminal activities, including hacking.  By March 2023, Anthropic had established itself within the AI community as a safety-focused research lab with a robust public record in alignment, adversarial testing, and model security—all published under the Anthropic Marks.

### 1.    Anthropic's Cybersecurity Applications and Offerings

21.    Cybersecurity has been part of Anthropic's public-facing AI safety, research, and product work since at least 2023.  On July 25, 2023, Anthropic published a security framework for frontier AI systems on its website, proposing security controls such as multi-party authorization for AI-critical infrastructure and secure software development standards aligned with the National Institute of Standards and Technology guidelines, and closer cooperation between AI companies and government agencies.  Anthropic stated that it was implementing those controls and published the framework to advance public discussion about secure deployment of frontier models.[1]  The same week, Anthropic announced a dedicated Frontier Red Team to conduct adversarial testing of its AI models against serious threat scenarios, including cybersecurity, and committed at the White House to conduct internal and external security testing of its AI systems to guard against cybersecurity risks before release.[2]  Anthropic also joined

---

[1] ANTHROPIC, *Frontier Model Security*, (July 25, 2023), available at https://www.anthropic.com/news/frontier-model-security
[2] ANTHROPIC, *Frontier Threats Red Teaming for AI Safety,* (July 26, 2023), available at https://www.anthropic.com/research/frontier-threats-red-teaming-for-ai-safety.

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

5

Google, Microsoft, and OpenAI in forming the Frontier Model Forum, an industry body whose stated objectives include supporting applications to combat cyber threats.[3]  Each of these publications and announcements appeared under the Anthropic Marks on Anthropic's website, as shown, for example, in the "Frontier Model Security" post below:

22.    Anthropic's 2023 cybersecurity commitments have led to a sustained and expanding presence in the cybersecurity community.  In August 2023, the White House announced the Defense Advanced Research Project Agency's ("DARPA") AI Cyber Challenge ("AIxCC"), a multi-year, U.S.-government-backed competition designed to use AI to identify and patch software vulnerabilities in critical infrastructure, and named Anthropic as one of the leading partners to make its technology available to competition participants.  In 2024, Anthropic sponsored, exhibited, or attended BSidesSF 2024, DEF CON 2024, and Black Hat USA 2024— three of the largest cybersecurity conferences in the United States—where it demonstrated its AI models' cybersecurity capabilities; supported DARPA AIxCC semifinalists; distributed promotional materials bearing the Anthropic Symbol; and presented to enterprise cybersecurity audiences and decision-makers.  That same year, Anthropic co-founded the Coalition for Secure AI, and entered formal pre-deployment testing agreements with both the U.S. Artificial Intelligence Safety Institute (now known as the U.S. Center for AI Standards and Innovation) and the U.K. AI Safety Institute, and launched a vulnerability disclosure program that further deepened Anthropic's engagement with the cybersecurity community by inviting researchers to

---

[3] ANTHROPIC ET AL., *Frontier Model Forum*, (July 26, 2023), available at https://www-cdn.anthropic.com/1095a748082bb69e714d1d550713e203b7114166/frontier-model-forum.pdf; *see also* Nickie Louise, *OpenAI, Google, Others Launch Frontier Model Forum, a New AI Industry Group to Promote Safe and Responsible AI*, TECHSTARTUPS.COM (July 26, 2023), available at https://techstartups.com/2023/07/26/openai-google-others-launch-frontier-model-forum-a-new-ai-industry-group-to-promote-responsible-ai-and-safety/.

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

identify flaws in Anthropic's software.  Anthropic also maintained a Frontier Red Team with a cybersecurity sub-team that conducts both offensive and defensive cybersecurity research, and conducted cybersecurity briefings for U.S. government officials, including within the Department of Defense.

23.    In March 2025, Anthropic's Frontier Red Team published a progress report documenting how its AI models' cybersecurity capabilities had evolved across four successive model generations.[4]  The report described 2024 as a "zero to one" moment in the cyber domain and explained that, in less than a year, Anthropic's models had advanced from high-school-level performance to college-undergraduate-level performance on standard Capture the Flag exercises—a form of competitive cybersecurity challenge used across the industry to test offensive and defensive skills.  Working with Carnegie Mellon University researchers, the team also ran experiments on realistic simulated networks and found that Anthropic's models, equipped with purpose-built tools, could carry out a multi-stage simulated attack modeled on a known large-scale real-world data breach.  By late 2025, Anthropic publicly stated that AI models were "now useful for cybersecurity tasks in practice, not just theory."

24.    In February 2026, Anthropic began introducing dedicated cybersecurity offerings, including Claude Code Security (later rebranded to Claude Security), which scans codebases for vulnerabilities and suggests targeted patches.  In April 2026, Anthropic announced Project Glasswing, a defensive-cybersecurity initiative for identifying and remediating vulnerabilities at scale, supported by partners including Amazon Web Services, Cisco, CrowdStrike, Microsoft, and Palo Alto Networks.[5]  And in June 2026, through Project Glasswing, Anthropic launched Claude Mythos 5—described as having "the strongest cybersecurity capabilities of any model in the world"[6]— for use by select cyberdefenders and infrastructure providers.  Anthropic simultaneously deployed Claude Fable 5, a version of the same underlying model configured with

---

[4] ANTHROPIC, Strategic Warning for AI Risk: Progress and Insights from Our Frontier Red Team (Mar. 19, 2025), available at https://www.anthropic.com/news/strategic-warning-for-ai-risk-progress-and-insights-from-our-frontier-red-team.
[5] ANTHROPIC, *Project Glasswing* (Apr. 7, 2026), available at https://www.anthropic.com/glasswing.
[6] ANTHROPIC, *Claude Fable 5 and Claude Mythos 5* (Jun. 9, 2026), available at https://www.anthropic.com/news/claude-fable-5-mythos-5.

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

robust cybersecurity safeguards for general availability.  The extensive public attention given to these models' offensive and defensive security capabilities further reinforced Anthropic's position at the forefront of AI-powered cybersecurity.

25.    Anthropic's sustained cybersecurity activities since 2023—over the years spanning published research, government partnerships, exhibition at major cybersecurity conferences, live demonstrations of its software's cybersecurity capabilities, and, later, dedicated cybersecurity product launches—have been public-facing and conducted under the Anthropic Marks in the ordinary course of Anthropic's trade.  These activities have generated goodwill and brand recognition among the same enterprise customers that both Anthropic and Abnormal seek to serve, and are designed to promote Anthropic's AI safety research and commercial AI solutions to the cybersecurity community.

### 2.    Anthropic's Visual Brand Identity

26.    Anthropic promotes its products and services under Anthropic's distinctive source-identifiers through a unified public presence anchored by its website https://www.anthropic.com, cloud marketplaces, mobile app stores, electronic newsletters, and social media platforms, including LinkedIn, YouTube, and X.  Across these channels, Anthropic presents all of its offerings—including its Claude software suite—as Anthropic-branded products, reinforcing the association between Anthropic's deliberately cultivated brand identity and its expanding family of products and services.

27.    Anthropic's visual brand identity pairs its human-centered mission with distinctive recurring design elements, including the Anthropic Logo and the Anthropic Symbol, in multiple consumer-facing touchpoints.  As shown below, Anthropic uses the Anthropic Symbol as a central source-identifier across public channels, including social-media profiles, developer platforms, research materials, and promotional content.

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

8

**Anthropic on X**

**Anthropic on LinkedIn**





**Anthropic on GitHub**

**Anthropic on YouTube**





28.     On Anthropic's website, the Anthropic Logo and the Anthropic Symbol are complementary expressions of a unified brand identity, and each serves independently as a source identifier for Anthropic's goods and services.  The Anthropic Logo appears in prominent placements such as page headers, while the Anthropic Symbol appears in other placements such as browser tabs and mobile interfaces.  Anthropic reinforces the connection between them through the Anthropic Motions: on virtually every page, the Anthropic Logo appears at the top of the screen and, as the user scrolls down, progressively compresses until only the Anthropic Symbol remains.  When the user scrolls back up, the sequence reverses and the Anthropic Logo re-expands.  Anthropic uses the same progression in product-launch videos, keynote presentations, and promotional content.[7]

**Still Images of the Anthropic Logo to Anthropic Symbol Progression**

| ANTHROP\C | ANTHROP\C | A          \ | A\ |

---

[7] The animated progression described in this paragraph is the subject of Anthropic's U.S. Trademark Application Serial Nos. 99/897,637 and 99/897,630, each covering one direction of the sequence.  These applications are discussed further in Paragraphs 34-35 *infra*.

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

29. Anthropic's visual identity reflects deliberate brand-development work tied to the company's mission and technical focus. Anthropic partnered with Geist, a design agency, to build an identity that, in Geist's words, would stand "apart in a category rife with tech tropes." Geist described the design as "a pure, typographic logo with a single standout detail. The slash is a reference to the code that underlays AI, and a nod to the future ahead." Geist later expanded that identity into a broader digital brand system for Claude, enabling Anthropic to present both its flagship product and "the company behind it" through a unified visual language.

30. Anthropic's rapid growth—from $100 million in annualized run-rate revenue in January 2024 to more than $47 billion in May 2026—has exposed that brand identity to a large and growing audience. As of May 2026, Anthropic's LinkedIn account had more than 3.5 million followers, its X account had approximately 1.3 million followers with nearly 50 million views in the prior 30 days, and its YouTube channel had more than 630,000 subscribers, all displaying the Anthropic Symbol as the account's profile image.

31. Anthropic's growth has also been accompanied by extensive media coverage across national news, business, and technology publications. TIME published a feature titled "How Anthropic Became the Most Disruptive Company in the World" and named Anthropic to its TIME100 Most Influential Companies list in both 2025 and 2026. The New Yorker profiled the company and its technology in a long-form feature, and WIRED examined how Anthropic's coding tools are reshaping software development. Coverage from The Wall Street Journal, The Financial Times, The Washington Post, Bloomberg, Axios, Business Insider, Fast Company, The New York Times, Reuters, and Forbes, among others, has further deepened public awareness of Anthropic and its AI offerings. Much of this coverage has prominently displayed the Anthropic Symbol in connection with its reporting.

32. Through intentional brand development, sustained investment in research and product development, rapid commercial growth, and extensive media coverage, Anthropic has built significant consumer recognition and goodwill in the Anthropic name and the Anthropic Marks. Anthropic continues to reinforce that identity across consumer, enterprise, developer, marketplace, and cybersecurity channels.

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

10

**B.      Anthropic's Trademark Rights**

33.     On November 6, 2025, Anthropic filed four U.S. trademark applications to register its distinctive Anthropic Symbol with the United States Patent and Trademark Office ("USPTO"), each on a use-in-commerce basis under Section 1(a) of the Lanham Act, covering the full range of goods and services Anthropic offers under the mark:

| U.S. Application Serial No. | Goods & Services |
| --- | --- |
| App. No. 99/483,732<br><br>Claimed First Use:<br>May 28, 2021 | International Class 035: Market research in the field of public policy; consumer research in the field of public policy; public policy consultation; market research related to the societal implications of artificial intelligence; consumer research related to the societal implications of artificial intelligence; promoting public awareness of scientific research and development, artificial intelligence, the ethical aspects of artificial intelligence, computer science, and computer software design and development; providing business consulting services in the fields of artificial intelligence, computer science, and computer software design and development. |
| App. No. 99/483,730<br><br>Claimed First Use:<br>May 28, 2021 | International Class 042: Providing temporary use of on-line non-downloadable software in the nature of an artificial intelligence model for performing generative text AI tasks and natural language processing AI tasks and for writing content based on a theme, summarizing text, document question-answering and simulating natural conversation; application service provider featuring application programming interface (API) software for performing generative text AI tasks and natural language processing AI tasks and for writing content based on a theme, summarizing text, document question-answering and simulating natural conversation; software as a service (SAAS) featuring software using artificial intelligence for performing generative text AI tasks and natural language processing AI tasks and for writing content based on a theme, summarizing text, document question-answering and simulating natural conversation; application service provider featuring application programming interface (API) software; scientific research and development; research and development services in the fields of artificial intelligence, computer science, and computer software design and development; research, design and development of computer programs and software; providing product development and engineering services in the field of artificial intelligence; providing technical research in the fields of artificial intelligence, computer science, and computer software design and development; providing consultation in the design and development of technology in the fields of artificial intelligence, computer science, and computer software design and development; technological research in the field of deep learning for public policy purposes; technological research in the field of artificial intelligence for public policy purposes; technological research |

| | |
|---|---|
| | in the field of artificial intelligence and public policy; technological research on the societal implications of artificial intelligence for public policy purposes; technological research to evaluate and understand the capabilities, limitations, and potential for societal impact of artificial intelligence systems for public policy purposes. |
| App. No. 99/483,731<br><br>Claimed First Use:<br>Feb. 7, 2023 | International Class 041: Educational services, namely, organizing and conducting live and online training in the fields of scientific research and development, artificial intelligence, computer science, and computer software design and development; providing online non-downloadable publications in the nature of articles, research papers, reports, and newsletters in the fields of scientific research and development, artificial intelligence, computer science, and computer software design and development; providing a website featuring non-downloadable publications in the nature of articles, research papers, reports, and newsletters in the fields of scientific research and development, artificial intelligence, computer science, and computer software design and development. |
| App. No. 99/483,735<br><br>Claimed First Use:<br>May 1, 2024 | International Class 009: Downloadable computer software in the nature of an artificial intelligence model for performing generative text AI tasks and natural language processing AI tasks and for writing content based on a theme, summarizing text, document question-answering and simulating natural conversation; downloadable software in the nature of a downloadable mobile application featuring an artificial intelligence model for performing generative text AI tasks and natural language processing AI tasks and for writing content based on a theme, summarizing text, document question-answering and simulating natural conversation; downloadable electronic publications in the nature of articles, research papers, reports, and newsletters in the fields of artificial intelligence, computer science, and computer software design and development; downloadable computer software for use as an application programming interface (API). |

34.    On June 22, 2026, Anthropic also filed applications to register two motion marks depicting the distinctive animated transition described in Section A, in which the Anthropic Logo compresses into the Anthropic Symbol, and vice versa.  The two applications cover the same animated sequence in each direction: one depicting the forward compression from the full Anthropic Logo to the Anthropic Symbol (the "Anthropic Forward Motion"), and one depicting the reverse expansion from the Anthropic Symbol to the Anthropic Logo (the "Anthropic Reverse Motion," and together with the Anthropic Forward Motion, the "Anthropic Motions"):

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

| U.S. Application Serial No. | Mark |
| --- | --- |
| App. No. 99/897,637<br><br>Claimed First Use: Mar. 10, 2023 | Anthropic Forward Motion<br><br>A\  \|  A    \  \|  A<small>NTHROP</small>\C  \|  ANTHROP\C |
| App. No. 99/897,630<br><br>Claimed First Use: Mar. 10, 2023 | Anthropic Reverse Motion<br><br>ANTHROP\C  \|  A<small>NTHROP</small>\C  \|  A    \  \|  A\ |

35.     Each application seeks registration for "downloadable computer software in the nature of an artificial intelligence model for performing generative text AI tasks and natural language processing AI tasks and for writing content based on a theme, summarizing text, document question-answering and simulating natural conversation; downloadable computer software for use as an application programming interface (API); downloadable reports featuring economic and societal impacts of artificial intelligence; downloadable written articles in the field of artificial intelligence, machine learning, and economic and societal impacts of artificial intelligence; downloadable electronic publications in the nature of reports and articles in the field of artificial intelligence, machine learning, and economic and societal impacts of artificial intelligence; downloadable data sets in the field of artificial intelligence and machine learning; downloadable data sets in the field of societal, economic, ethical, and political impacts and effects of artificial intelligence; downloadable data sets in the field of sociology; downloadable data sets in the field of economics" in International Class 9; "compilation of statistics; compiling and analyzing statistics, data and other sources of information for business purposes; economic forecasting services; providing information and analysis in the fields of economics and business; economic forecasting and analysis; business research in the field of economics; business research and data analysis services in the field of artificial intelligence, machine learning, economic and societal impacts of artificial intelligence; providing public policy information via a website; promoting public interest and awareness of artificial intelligence, machine learning, economic and societal impact of artificial intelligence; promoting public awareness of economic and societal impacts of artificial intelligence by means of public advocacy; providing public policy

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

13

information in the field of artificial intelligence, machine learning, economic and societal impacts of artificial intelligence, impact of artificial intelligence on labor markets; market research in the field of public policy; consumer research in the field of public policy; providing business consulting services in the fields of artificial intelligence, computer science, and computer software design and development" in International Class 35; "educational services, namely, organizing and conducting live and online training in the fields of scientific research and development, artificial intelligence, computer science, and computer software design and development; providing online non-downloadable publications in the nature of articles, research papers, reports, and newsletters in the fields of scientific research and development, artificial intelligence, computer science, and computer software design and development; providing a website featuring non-downloadable publications in the nature of articles, research papers, reports, and newsletters in the fields of scientific research and development, artificial intelligence, computer science, and computer software design and development" in International Class 41; and "providing on-line non-downloadable software for displaying, searching, filtering, and analyzing data and statistics relating to the economic impact and adoption of artificial intelligence technology; providing temporary use of on-line non-downloadable software in the nature of an artificial intelligence model for performing generative text AI tasks and natural language processing AI tasks and for writing content based on a theme, summarizing text, document question-answering and simulating natural conversation; software as a service (SAAS) featuring software using artificial intelligence for performing generative text AI tasks and natural language processing AI tasks and for writing content based on a theme, summarizing text, document question-answering and simulating natural conversation; application service provider featuring application programming interface (API) software for performing generative text AI tasks and natural language processing AI tasks and for writing content based on a theme, summarizing text, document question-answering and simulating natural conversation; application service provider featuring application programming interface (API) software; scientific research and development services in the fields of artificial intelligence, machine learning, and deep learning; technological research in the fields of artificial intelligence and deep learning for public policy purposes,

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

14

including research on the societal implications of artificial intelligence; computer software design and development; providing product development and engineering services for others in the field of artificial intelligence" in International Class 42.

36. The Anthropic Symbol and Anthropic Motions are non-functional and inherently distinctive as applied to Anthropic's goods and services. The Anthropic Symbol is a unitary design mark consisting of a geometric letterform and an integrated descending slash element—a stylistic reference to the code that underlies all software. The mark serves no utilitarian function, as it does not affect the cost, quality, or performance of Anthropic's offerings. It is also highly distinctive: the descending slash is inspired by the computing environment in which Anthropic's software operates, but neither the composite design nor any individual element immediately conveys the nature, quality, or function of the underlying goods or services. The USPTO confirmed as much when it accepted the Anthropic Symbol for examination without issuing a descriptiveness or genericness refusal.

37. The Anthropic Motions are likewise non-functional and highly distinctive. The animated sequences are a deliberate branding choice, not a functional necessity, and serve a purely source-identifying purpose. They confer no functional or competitive advantage and do not immediately describe or convey any attribute of Anthropic's underlying goods or services.

38. To the extent proof of secondary meaning is necessary, the Anthropic Symbol has acquired such distinctiveness. Anthropic has used the Anthropic Symbol continuously and prominently since at least May 28, 2021. Anthropic has invested substantial resources in advertising and promoting its products and services under the Anthropic Symbol across its website, mobile app stores, cloud marketplaces, electronic newsletters, industry conferences, and social media platforms. Anthropic has received extensive unsolicited national media recognition expressly associating the Anthropic Symbol with Anthropic. And Anthropic has accumulated millions of followers across its social media accounts, each of which displays the Anthropic Symbol as the account's profile image. As a result, the relevant consuming public is likely to associate the Anthropic Symbol with Anthropic as the single source. That Abnormal appears to have deliberately copied the Anthropic Marks, as described further below, only reinforces their

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

15

distinctiveness because Abnormal's decision to appropriate that mark is itself evidence that the mark has achieved a degree of consumer recognition that another party wishes to emulate for itself.

39. Anthropic has used the Anthropic Symbol in the United States since at least as early as May 28, 2021 in connection with its artificial intelligence research, since at least as early as February 7, 2023 in connection with non-downloadable AI software services, and since at least as early as May 1, 2024, in connection with downloadable AI software. Anthropic has also used the Anthropic Motions as source identifiers since at least as early as March 10, 2023. Through this continuous use, Anthropic has established common law rights in the Anthropic Marks for these goods and services.

40. As a result of Anthropic's significant investment of resources, efforts, and innovations in the field of artificial intelligence, together with its deliberate and sustained investment in developing a distinctive visual brand identity, the Anthropic Marks have come to symbolize the high quality, reliability, trustworthiness, and source of Anthropic's goods and services. The Anthropic Marks have gained substantial recognition and goodwill, which are invaluable and belong exclusively to Anthropic.

### C. Abnormal's Business and Infringing Marks

41. Abnormal was founded in 2018 and initially operated under the name "Abnormal Security." Abnormal changed its corporate name from "Abnormal Security Corporation" to "Abnormal AI, Inc." on March 28, 2025, sixteen days after filing its intent-to-use trademark application for the Infringing Logo.

42. Abnormal's core business is AI-powered enterprise cybersecurity software, including cloud email security, account takeover protection, messaging security, SaaS security, and related computer security services. Abnormal markets its offerings to chief information security officers, security teams, IT administrators, and enterprise technology decision-makers, among others. As of April 2025, Abnormal claimed thousands of enterprise customers, including over 20% of the Fortune 500.

43.     Abnormal has publicly disclosed that Anthropic's AI software is embedded across its engineering operations.  In November 2025, Abnormal stated on its website that "Claude Code and other AI tools now initiate a large share of pull requests across Abnormal," and in January 2026, Abnormal disclosed that one of its core internal tools "is built on Claude Code and deeply optimized for Abnormal's codebase."  Current Abnormal job postings seek candidates with experience in "AI development tools such as Cursor, GitHub Copilot, or Claude."

44.     Abnormal has been an Anthropic customer since before April 2025, when Abnormal executed a comprehensive rebrand—changing its name from "Abnormal Security" to "Abnormal AI," migrating to the domain <abnormal.ai>, and adopting an entirely new visual identity.  The rebrand was led in substantial part by the design agency Shaped By, which delivered a new design system, website, brand film, brand guidelines, and motion assets.  Abnormal's underlying products and services did not materially change; the company framed the rebrand as reflecting its evolution into "a broader AI-native security platform."  Shaped By characterized the resulting identity as one designed "to match a category leader"—a veiled reference to Anthropic—and to make Abnormal "unmistakably AI-native, human-focused, and future-obsessed."  The company's "About Us" page now presents Abnormal as "A Pioneering Team of Humans and AI Agents" and features taglines like "Abnormal Behavioral AI to Protect Humans."

45.     The centerpiece of Abnormal's new identity is the Infringing Logo: /\\.  Prior to the April 2025 rebrand, Abnormal's logo consisted solely of a letterform with no additional design elements.  The new logo adds a line arranged parallel to the rightmost slanting side of the letterform in Abnormal's original logo.  This additional element in the Infringing Logo is not merely an insignificant alteration; it is the defining feature that creates confusing similarity with Anthropic's Anthropic Marks, and its introduction fundamentally changes the commercial impression of the mark.  As shown in the comparison below, the Infringing Logo presents virtually identical core visual elements in a virtually identical spatial arrangement as the Anthropic Symbol:

| Abnormal's Infringing Logo | Anthropic's Anthropic Symbol |
|---|---|
| /\\ | A\ |

46.    With the rebrand, Abnormal also deployed the Infringing Sequences.  In one direction, Abnormal's **Λbnormal** mark compresses into the Infringing Logo; in the other direction, the Infringing Logo expands into the full mark.  Abnormal has used these sequences in promotional and trade-show contexts, including at major industry cybersecurity conferences.  As shown in the representative comparisons below, the progression closely mirrors Anthropic's distinctive Anthropic Motions, in which the Anthropic Logo progressively compresses into the Anthropic Symbol and vice versa:

| Progressive Images of the Anthropic Reverse Motion vs. Abnormal's Corresponding Infringing Sequence |
|---|



| Progressive Images of the Anthropic Forward Motion vs. Abnormal's Corresponding Infringing Sequence |
|---|



47.    The Infringing Marks are confusingly similar to the Anthropic Marks in appearance and commercial impression.  The Infringing Logo replicates the core visual elements of the Anthropic Symbol—a geometric letterform paired with a parallel slash-like stroke—in substantially the same proportions and spatial arrangement, producing a nearly identical overall impression.  The Infringing Sequences likewise mirror the Anthropic Motions, employing the same distinctive progressions in which a full logo either transitions into a compact symbol or

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

expands from it.  Further, Abnormal's rebrand was expressly intended to make the company appear "human-focused" and "AI-native"—the same thematic pairing that defines Anthropic's brand.  Considered together, the near-identical static logo, the parallel animated sequence, and the shared human-centric AI positioning create a cumulative commercial impression that heightens the likelihood of consumer confusion.

48.    The confusing similarity between the Infringing Marks and the Anthropic Marks is further compounded by the substantial relatedness between the parties' offerings.  Both parties offer AI-powered enterprise software products and services that are similar in use and function, are promoted to an overlapping class of consumers, and are at minimum complementary. Abnormal's own platform is powered in part by Anthropic's Claude software, meaning Abnormal adopted a near-identical mark for offerings built in part on Anthropic's own technology. Anthropic, in turn, has extended its AI technology into its own dedicated cybersecurity initiatives, including Claude Security and Project Glasswing, both marketed under the Anthropic Marks. Anthropic's documented expansion from longstanding cybersecurity research and engagement into dedicated cybersecurity offerings represents a natural zone of expansion of the Anthropic Marks, such that consumers encountering Abnormal's AI-native security platform under a confusingly similar mark are likely to believe that it originates from, is sponsored by, or is affiliated with Anthropic.

49.    The parties also reach the same enterprise audiences through the same commercial channels.  Both companies' products integrate into the same enterprise application stacks— including Microsoft 365, Google Workspace, Slack, Salesforce, and ServiceNow—and both pass through the same IT, security, compliance, and procurement review that governs enterprise software deployments generally, meaning the same organizational stakeholders who evaluate and approve Abnormal's AI security platform also evaluate and approve Anthropic's AI products. Both companies attend the same industry conferences, including confirmed co-presence at the AWS Summit in Toronto in June 2026.  And both companies also participate in overlapping partner ecosystems: CrowdStrike, for example, is a launch partner for Anthropic's Project Glasswing cybersecurity initiative and simultaneously a long-standing alliance partner and

investor in Abnormal.[8]  In addition, Abnormal has contacted Anthropic to explore a joint conference presentation, further demonstrating the commercial proximity between the two companies and the potential for confusion among industry participants who encounter both parties in the same professional settings.

50.    Abnormal's own public statements confirm that it defines its business by reference to the same category of commercially available artificial intelligence models that Anthropic develops and offers under the Anthropic Marks.  Indeed, as early as November 14, 2023, Abnormal hosted a panel titled "Securing the Future with AI: A Discussion Among Leading AI Experts" that featured, among others, OpenAI's then-head of go-to-market strategy.  The panel, organized and promoted by Abnormal, addressed the convergence of generative AI and cybersecurity—confirming that Abnormal recognized, no later than November 2023, that enterprise cybersecurity and generative AI tools occupied overlapping or converging markets, and that cybersecurity was an area of focus, or at the very least within a natural zone of expansion, for generative-AI companies such as Anthropic.

51.    Abnormal has also published blog posts discussing Anthropic's AI capabilities in cybersecurity, including posts dated April 1, 2024,[9] May 6, 2025,[10] August 29, 2025,[11] and January 21, 2026,[12] demonstrating that Abnormal not only was aware of Anthropic's presence in cybersecurity but actively wrote about it in its own marketing materials.  And in March 2026, Abnormal released what it describes as a "behavioral foundation model" for cybersecurity, trained on more than one billion derived behavioral signals, placing Abnormal squarely in the AI

---

[8] On information and belief, CrowdStrike is an investor in Abnormal. A. Sraders, *Abnormal Security's CEO Explains how "defensive A.I." will someday defeat cyber attacks*, FORTUNE, (November 11, 2024), available at https://finance.yahoo.com/news/abnormal-security-ceo-explains-defensive-113717301.html (mentioning that Abnormal "raised an undisclosed amount of funding from CrowdStrike Holdings" in March 2023).

[9] J. Hill, *5 ChatGPT Jailbreak Prompts Being Used by Cybercriminals*, ABNORMAL AI, (April 1, 2024), available at https://abnormal.ai/blog/chatgpt-jailbreak-prompts.

[10] C. Baron & P. Wojtyla, *Bypassing Safeguards in Leading AI Tools: ChatGPT, Gemini, Claude*, ABNORMAL AI, (May 6, 2025), available at https://abnormal.ai/blog/bypassing-safeguards-ai-tools-chatgpt-gemini-claude.

[11] C. Baron, *Vibe Hacking and AI-Enabled Threats: Lessons from Anthropic's Report*, ABNORMAL AI, (August 29, 2025), available at https://abnormal.ai/blog/vibe-hacking-ai-enabled-threats-anthropic-report.

[12] *AI-Powered Cyber Attacks Examples That Changed Enterprise Security*, ABNORMAL AI, (January 21, 2026), available at https://abnormal.ai/blog/ai-powered-cyber-attacks-examples.

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

product category in which Anthropic develops and offers its own branded AI models.[13]

52. Abnormal's chief executive officer, Evan Reiser, has also publicly described the launch of commercial generative artificial intelligence tools as the catalyst for the company's strategic focus.[14] Abnormal has released features and published research centered on those tools, including a capability designed to detect whether an email was generated using commercial generative artificial intelligence[15], and a survey report framing enterprise risk in terms of named, commercially available generative artificial intelligence models.[16] Abnormal has also presented its artificial-intelligence-and-cybersecurity positioning at industry events alongside leading AI companies and Anthropic competitors including OpenAI.[17]

53. Abnormal's statements and publications reinforce that relevant consumers encounter Abnormal and Anthropic within the same artificial intelligence category, increasing the likelihood that consumers will perceive Abnormal's AI-native security platform offered under the Infringing Marks as originating from, sponsored by, or affiliated with Anthropic.

54. Anthropic's rights in the Anthropic Marks long predate Abnormal's adoption of the Infringing Marks. Anthropic has used the Anthropic Symbol continuously since at least as early as May 28, 2021 in connection with artificial intelligence research, since at least as early as February 7, 2023 in connection with non-downloadable AI software services, and since at least as early as May 1, 2024 in connection with downloadable AI software—years before Abnormal's

---

[13] *Abnormal AI Delivers Behavioral Foundation Model to Combat the Era of AI-Driven Attacks,* ABNORMAL AI, (Mar. 17, 2026), available at https://abnormal.ai/about/news/announcing-attune-1.0.

[14] A. Sraders, *Abnormal Security's CEO Explains how "defensive A.I." will someday defeat cyber attacks*, FORTUNE, (November 11, 2024), available at https://finance.yahoo.com/news/abnormal-security-ceo-explains-defensive-113717301.html.

[15] *Id.* (describing Abnormal's release of "CheckGPT," a tool to determine whether an email was written using generative artificial intelligence tools such as ChatGPT).

[16] *The State of Email Security in an AI-Powered World How Security Leaders are Responding to the Generative AI Threat,* ABNORMAL SECURITY, (October 24, 2023) ("The rise of generative AI has been nothing short of meteoric. Tools like ChatGPT and Google Bard are becoming increasingly popular among people who wish to use them for legitimate purposes—inspired by the efficiency they create. However, cybercriminals are also embracing this technology.").

[17] *See, e.g.,* M. Scott, *The Convergence of AI + Cybersecurity: Announcing Our Limited Series with Fast Company*, ABNORMAL SECURITY, (August 30, 2023), available at https://abnormal.ai/blog/announcing-convergence-series (describing a November 14, 2023 panel titled "Securing the Future with AI: A Discussion Among Leading AI Experts" led by OpenAI's then head of go-to-market strategy, joined by Abnormal's CEO and a CrowdStrike speaker).

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

April 2025 rebrand introduced the Infringing Logo.  Anthropic has likewise used the Anthropic Motions as source identifiers since at least as early as March 10, 2023, well before Abnormal adopted the Infringing Sequences.

55.    Anthropic's branded presence in the cybersecurity space also predates Abnormal's rebrand.  As detailed above, Anthropic published foundational AI safety and security research under the Anthropic Marks beginning in 2021, and from 2023 onward maintained a sustained and expanding public presence in the cybersecurity community through government partnerships, conference exhibitions, adversarial testing, and vulnerability research—all conducted under the Anthropic Marks nearly two years before Abnormal adopted the Infringing Marks in April 2025.

56.    Abnormal adopted the Infringing Marks with actual knowledge of Anthropic's prior rights.  Abnormal has been a paying Anthropic customer since at least as early as January 3, 2025.  Upon information and belief, Abnormal and its personnel encountered the Anthropic Marks by engaging with Anthropic's https://www.anthropic.com website prior to January 3, 2025 and were familiar with Anthropic's brand identity before developing the Infringing Marks.  Upon information and belief, these employees that engaged with Anthropic's website prior to January 3, 2025 include, but are not limited to, Evan Reiser (Abnormal's Founder & CEO), Mike Britton (Abnormal's then Chief Information Security Officer), and Preston Graham (Abnormal's then-Vice President & Controller).

57.    Despite this knowledge, Abnormal adopted the Infringing Marks in April 2025 and has since continued to escalate its use by launching additional AI-driven security offerings under product names such as "AI Security Agents," "AI Security Mailbox," and "AI Phishing Coach"; filing for trademark protection in nine additional countries; opening a physical storefront in San Francisco bearing the Infringing Logo; and expanding its online and event-based marketing.  As Abnormal deepens its position as an "AI-native" platform under a near-identical mark while Anthropic continues extending its own technology further into cybersecurity applications, the overlap between the parties' offerings, channels, and audiences will only grow—and with it, the likelihood that consumers will view Abnormal's AI security platform as coming from, sponsored by, or affiliated with Anthropic.  This likelihood is heightened by the fact that Abnormal markets

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

itself as a "human-centered" and "AI-native" security company and publicizes its use of Anthropic's AI models in its own products.

### D.    Abnormal's Trademark Applications and Notice of Infringement

58.    On March 12, 2025, Abnormal filed U.S. Trademark Application Serial No. 99/080,304 (the "'304 Application") with the USPTO on an intent-to-use basis under Section 1(b) of the Lanham Act, seeking registration of the Infringing Logo for "online non-downloadable software using artificial intelligence for machine learning in the field of cybersecurity" and related services in International Class 42.  The '304 Application was approved for publication on August 20, 2025 and published for opposition on September 23, 2025.

59.    On August 18, 2025, Anthropic, through its account manager, contacted Abnormal, noting that the parties' logos were "quite similar" and requesting that Abnormal change the stylization of its mark.  Abnormal's Legal Director responded that Abnormal believed the logos were distinct and that the companies operated in "different markets."  On August 27, 2025, Anthropic's intellectual property counsel followed up with a letter explaining the similarity between the Infringing Logo and the Anthropic Symbol, asserting Anthropic's prior rights, and offering a sixty-day transition period for Abnormal to phase out the Infringing Logo.  Abnormal refused.

60.    On November 17, 2025, Anthropic's outside counsel sent a formal demand letter to Abnormal's trademark counsel, demanding that Abnormal (1) abandon the '304 Application and corresponding International Registration No. 1,880,120, (2) cease use of the Infringing Logo, and (3) agree not to use or apply for confusingly similar marks in the future.  The letter reiterated that Anthropic does not object to Abnormal's use of its prior $\Lambda$ mark, and that Anthropic's objection is directed solely to the mark adopted in the April 2025 rebrand.

61.    On November 21, 2025, Anthropic filed Opposition No. 91303262 before the Trademark Trial and Appeal Board ("TTAB") against the '304 Application on grounds of priority and likelihood of confusion under Section 2(d) of the Lanham Act.  On March 23, 2026, Abnormal answered, and indicated again at the April 2026 discovery conference that it would not agree to change its logo.  The proceeding remains in discovery.

62.    The USPTO has independently confirmed the likelihood of confusion between the parties' marks.  The examining attorney issued non-final office actions against each of Anthropic's four pending Anthropic Symbol applications, citing Abnormal's earlier-filed '304 Application for the Infringing Logo as a bar to registration on likelihood-of-confusion grounds. Prosecution of Anthropic's applications is now suspended pending resolution of Abnormal's application, despite Anthropic's senior rights arising from actual, nationwide use of the Anthropic Symbol in commerce since 2021—nearly four years before Abnormal adopted the Infringing Logo in April 2025.

### E.    Abnormal Has Caused Actual Confusion and Harm to Anthropic

63.    Abnormal's use of the Infringing Marks has caused, and will likely continue to cause, confusion, mistake, or deception among consumers regarding the source, sponsorship, or affiliation of Abnormal's goods and services with Anthropic.

64.    In fact, Abnormal's adoption of the Infringing Marks has already generated actual confusion in the marketplace.  As shown below, on April 16, 2025, when Abnormal announced its rebrand from "Abnormal Security" to "Abnormal AI" on LinkedIn, one user commented: "Does the new logo look like Anthropic's or am I seeing double?"  Another replied: "look exactly same for me."  The original comment received 47 reactions, suggesting the observation resonated broadly with other viewers in the cybersecurity and AI professional community who encounter both parties' offerings.  The first commenter publicly identifies as a "Cyber Defense Sales Leader"—a job title squarely within the relevant consumer class of enterprise cybersecurity professionals and decision-makers who encounter both parties' marks.  The second commenter identifies as the "Founder & CEO" of a technology company.  The exchange occurred on Abnormal's own public rebrand announcement and was visible to the professional community that follows Abnormal.





65.    Further, Abnormal's earlier-filed application directly interferes with Anthropic's ability to secure federal registration of the Anthropic Symbol, as the USPTO has cited Abnormal's application as a bar to each of Anthropic's four pending Anthropic Symbol applications despite Anthropic's prior rights.

66.    Abnormal's conduct is ongoing and will continue unless enjoined.  Absent relief, Anthropic will suffer irreparable harm, including loss of control over the Anthropic Marks and the goodwill embodied in its visual identity.  Given the overlapping consumer classes, trade channels, and confusingly similar marks, there is a substantial likelihood that consumers encountering Abnormal's products and marketing materials will attribute them to Anthropic, or believe them to be sponsored by or affiliated with Anthropic, causing irreparable harm to the goodwill Anthropic has built in the Anthropic Symbol in the AI and cybersecurity markets, where brand trust is critical.

67.    Anthropic has no adequate remedy at law for the irreparable harm that it will suffer from loss of control of its Anthropic Marks and association with Abnormal.

### FIRST CLAIM FOR RELIEF
**Trademark Infringement and False Designation of Origin**
**15 U.S.C. § 1125(a)**

68.    Anthropic repeats and realleges each allegation set forth in paragraphs 1 through 67 above as if fully set forth herein.

69.    Anthropic has valid and protectable rights in the Anthropic Marks dating from its first use in commerce of the Anthropic Symbol, since at least as early as May 28, 2021.  These rights predate Abnormal's use of the Infringing Marks for software products and services in the

United States, which did not begin until, on information and belief, April 2025.

70. The acts of Abnormal described above constitute trademark infringement, unfair competition, and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

71. On information and belief, Abnormal had actual knowledge of Anthropic's ownership and use of the Anthropic Marks before it adopted the Infringing Marks. As alleged above, Abnormal was a paying Anthropic customer when it adopted the Infringing Marks. Upon information and belief, Abnormal employees involved in selecting and adopting the Infringing Logo were aware of Anthropic's marks before that adoption.

72. Abnormal's unauthorized use of the Infringing Marks as alleged above has caused and is likely to continue to cause confusion, mistake, or deception on the part of consumers as to the source, sponsorship, or approval of goods or services that Abnormal is offering under the Infringing Marks or that Anthropic is offering under the Anthropic Marks, or the affiliation, connection, or association between Abnormal and Anthropic, constituting trademark infringement, unfair competition, and false designation of origin in violation of 15 U.S.C. § 1125(a).

73. As a direct and proximate result of Abnormal's wrongful conduct, Anthropic has been, is now, and will be irreparably injured and damaged by Abnormal's aforementioned acts, and unless Abnormal is enjoined by the Court, Anthropic will suffer further harm to its name, reputation, and goodwill. This harm constitutes an injury for which Anthropic has no adequate remedy at law.

74. On information and belief, Abnormal has acted willfully and in bad faith to trade on Anthropic's rights, and the goodwill embodied in the Anthropic Marks, including by adopting the Infringing Marks while a paying Anthropic customer and with knowledge of the Anthropic Marks, and by refusing to cease use after receiving Anthropic's notice of infringement. This is an exceptional case, and Abnormal is liable for an award of its profits, Anthropic's damages (including corrective advertising damages), enhanced damages, as the Court finds just, and Anthropic's reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

## SECOND CLAIM FOR RELIEF
**Unfair Competition**
**California Bus. & Prof. Code §§ 17200 et seq.**

75.    Anthropic repeats and realleges each allegation set forth in paragraphs 1 through 74 above as if fully set forth herein.

76.    Abnormal's conduct, described above, constitutes unfair and unlawful business acts or practices and as such constitutes unfair competition under California Business & Professions Code §§ 17200 et seq.

77.    Abnormal's conduct constitutes unlawful business acts or practices in that Abnormal has engaged in trademark infringement, unfair competition, and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

78.    Abnormal's conduct constitutes unfair business acts or practices in that Abnormal's trademark infringement, false designation of origin, and unfair competition are likely to mislead or deceive, and have in fact misled and deceived.

79.    As a direct and proximate result of Abnormal's wrongful conduct, Anthropic has been, is now, and will be irreparably injured and damaged by Abnormal's aforementioned acts, and unless Abnormal is enjoined by the Court, Anthropic will suffer further harm to its name, reputation, and goodwill.  This harm constitutes an injury for which Anthropic has no adequate remedy at law.  As a further direct and proximate result of Abnormal's conduct, Anthropic has lost diverted sales and business opportunities, resulting in the diminished value of the Anthropic Marks and their associated goodwill, and Abnormal has been unjustly enriched at Anthropic's expense.

80.    On information and belief, Abnormal has acted with full knowledge of Anthropic's rights and with the intention to trade on those rights, as alleged above, and the aforementioned acts are willful and intentional.

81.    Defendant should be required to restore to Anthropic any and all profits earned as a result of its unfair or unlawful business acts or practices, or provide Anthropic with any other restitutionary relief as the Court deems appropriate.

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

27

## THIRD CLAIM FOR RELIEF
**Common Law Trademark Infringement**

82.     Anthropic repeats and realleges each allegation set forth in paragraphs 1 through 81 above as if fully set forth herein.

83.     The acts of Abnormal as described above constitute trademark infringement under California common law.

84.     Anthropic has valid and protectable rights in the Anthropic Marks dating from its first use in commerce, at least as early as May 2021.  These rights predate Abnormal's use of the Infringing Marks in the United States, which did not begin until at least April 2025.

85.     Abnormal had actual knowledge of Anthropic's ownership and use of the Anthropic Marks before it adopted the Infringing Marks, as alleged above, including because Abnormal was a paying Anthropic customer at the time of adoption.  Upon information and belief, Abnormal was familiar with Anthropic's brand identity before adopting the Infringing Logo.

86.     Abnormal's unauthorized use of the Infringing Marks as alleged above has caused and is likely to continue to cause consumers to believe that there is a relationship between Abnormal and Anthropic, and/or that Abnormal's goods and services are associated with or come from Anthropic (or vice versa), and such association constitutes common law trademark infringement.

87.     As a direct and proximate result of Abnormal's wrongful conduct, Anthropic has been, is now, and will be irreparably injured and damaged by Abnormal's aforementioned acts, and unless Abnormal is enjoined by the Court, Anthropic will suffer further harm to its name, reputation, and goodwill.  This harm constitutes an injury for which Anthropic has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Anthropic prays for the following relief:

1.      That judgment be entered in favor of Anthropic and against Abnormal on each and every Count of this Complaint;

2.      For entry of an order and judgment requiring that Abnormal and its officers, agents, servants, employees, owners, and representatives, and all other persons, firms, or corporations in active concert or participation with them, be enjoined during the pendency of this action and permanently thereafter from: (a) using in any manner the Infringing Marks, any other mark incorporating or substantially similar to the Anthropic Marks, or any other mark or name that is confusingly similar to or a colorable imitation of the Anthropic Marks; (b) doing any act or thing calculated or likely to cause confusion or mistake in the minds of the members of the public or prospective customers as to the source of the products or services offered or distributed by Anthropic or Abnormal, or likely to confuse members of the public or prospective customers into believing that there is some connection between Anthropic and Abnormal or any other entity owned by or associated with Abnormal; (c) otherwise competing unfairly with Anthropic in any manner; or (d) assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in parts (a) through (c) of this paragraph;

3.      For entry of an order and judgment directing Abnormal, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Anthropic within thirty (30) days after entry of the injunction a report in writing under oath setting forth in detail the manner and form in which Abnormal has complied with the injunction and ceased all offering of goods and services under the Infringing Marks, as set forth above;

4.      For entry of an order and judgment directing Abnormal, pursuant to 15 U.S.C. § 1118, to deliver up for destruction, or to show proof of said destruction or sufficient modification to eliminate the infringing matter, all digital assets, catalogs, articles, signage, products, displays, labels, circulars, letterhead, business cards, promotional items, clothing, literature, or other matter in the possession, custody, or under the control of Abnormal or its agents bearing any of the Infringing Marks, or any other mark that is confusingly similar to the

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

29

Anthropic Marks;

5. For a judgment awarding corrective advertising damages in an amount sufficient to remedy the likelihood of confusion and deception caused by Abnormal's infringement;

6. For a judgment in the aggregate amount of (a) Abnormal's profits, (b) Anthropic's actual damages (including corrective advertising damages), (c) the costs of this action pursuant to 15 U.S.C. § 1117, and (d) restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Abnormal as a result of its unlawful and/or unfair business acts or practices;

7. That the Court award enhanced damages under 15 U.S.C. § 1117;

8. That the Court award Anthropic its reasonable attorneys' fees; and

9. That the Court grant such other and further relief as it deems just and proper.

## JURY DEMAND

Anthropic demands a jury trial in this matter as to all matters triable by a jury.


Dated:        July 1, 2026                     DARALYN J. DURIE
                                               JOYCE LIOU
                                               JACK WILLIAM HAISMAN
                                               HOLLY M. PETERSEN
                                               MORRISON & FOERSTER LLP


                                       By:    /s/ *Joyce Liou*
                                               Joyce Liou

                                               Attorneys for Plaintiff
                                               ANTHROPIC, PBC

COMPLAINT AND DEMAND FOR JURY TRIAL
Case No. 3:26-cv-6754

30